UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

QBE Americas, Inc.,                                   Civ. No. 14-5020 (PAM/TNL)

              Plaintiff,

v.                                         **MEMORANDUM AND ORDER**

John McDermott,

              Defendant.

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction. For the reasons that follow, the Motion is granted.

**BACKGROUND**

Defendant John McDermott was, until the end of November 2014, the Senior Vice President of Sales and Marketing at NAU Country Insurance Corporation, a subsidiary of Plaintiff QBE Americas, Inc. NAU provides crop insurance to farmers throughout the nation, and it is one of only 18 USDA-approved providers of such insurance. In his capacity as Senior Vice President, McDermott formulated the company's strategic plan and implemented sales, marketing, and business-development programs on a nationwide basis. (Compl. Ex. E (McDermott's QBE job description).) According to QBE, the crop insurance industry is highly competitive and requires insurance companies to maintain relationships with crop insurance agents and brokers. In addition, QBE asserts that nearly 90% of its crop insurance sales take place from January 1 to March 15, before the spring planting season begins. The significance of the next two-and-a-half months is a large part of the reason QBE

is seeking an injunction against McDermott here.

McDermott began working at NAU in 2005. Starting with his first promotion in 2006, McDermott and NAU executed several employment agreements that included covenants not to compete, and confidentiality and non-solicitation provisions. (See id. Exs. A-D.) After the first agreement in 2006 (id. Ex. A), each subsequent agreement is denominated as an "amendment" to the previous agreements. (See, e.g., id. Ex. B at 1 ("This AMENDMENT TO EMPLOYMENT AGREEMENT. . . .").) McDermott and NAU executed the last two of these amended agreements in April 2010, just before NAU and QBE merged. In exchange for executing the 2010 employment agreements, McDermott received a salary increase and eligibility for an increased bonus. The second of the April 2010 agreements also included a retention bonus to induce McDermott to remain at NAU through the merger. The second April 2010 agreement amended the first April 2010 in significant ways, including adding new confidentiality, noncompetition, and non-solicitation provisions. In relevant part, these provisions prohibited McDermott from:

> communicat[ing] to anyone other than the Company and those designated by the Company any trade secrets, business plans or other confidential information, knowledge or data relating to the Company or any of its subsidiaries or affiliates[;]
>
> * * *
>
> for twelve (12) months after the Date of Termination . . . directly or indirectly engag[ing] in or becom[ing] associated with any Competitive Activity. . . . "Competitive Activity" means crop insurance or any other business or endeavor in which the Company is engaged at the Date of Termination[;] [or]
>
> * * *

> for twelve (12) months after the Date of Termination . . . directly or indirectly, solicit[ing] for employment by other than the Company any person employed by the Company or any of its subsidiaries or affiliates.

(Compl. Ex. D. ¶¶ 6(a)(i), 6(b), 6(c).) The second April 2010 agreement provided, as had the others, that the noncompete, confidentiality, and non-solicitation provisions were in consideration for the benefits McDermott received in the form of increased bonus eligibility and increased salary, in addition to the retention bonus for remaining with the company for three months after the merger closed. (Id. ¶ 6(e).)

McDermott contends that sometime in 2012, he was informed that he was no longer an employee of NAU but was now an employee of QBE. (Def.'s Opp'n Mem. at 4) The implication is that he had little idea about the merger, which might cast doubt on the assignability of the covenants not to compete. But McDermott's claim of ignorance is belied by the second April 2010 agreement, which specifically references QBE several times. (See Compl. Ex. D ¶ 2(b) (discussing QBE Executive Committee's role in determining McDermott's bonus).)

In the fall of 2014, QBE informed McDermott that he would be laid off effective December 19, 2014, as part of a reduction in force. QBE offered McDermott a severance package of one year's salary. (Compl. ¶ 44.) According to QBE, McDermott told the company that he was willing to accept a different position, and the company intended to offer McDermott another position. Before it could do so, however, on November 25, 2014, McDermott resigned effective November 26, 2014. QBE reminded McDermott verbally and

3

by letter of his obligations under the second April 2010 agreement's restrictive covenants.[1] McDermott responded to QBE's letter, saying that he had "accepted a position as National Account Manager for Hudson Insurance Company." (Compl. Ex. H.) Hudson is one of the other 18 companies USDA-approved to sell crop insurance. McDermott's correspondence with QBE made clear that he had informed Hudson of his restrictive covenants with QBE.

In early December, Hudson mailed flyers to approximately 6,000 crop insurance agents nationwide, including its own agents as well as agents of QBE, regarding McDermott's employment with Hudson. (See id. Ex. L.) On December 15, 2014, Hudson's lawyers sent QBE a letter saying that Hudson disagreed with QBE "concerning the nature, extent and enforceability of the noncompetition provisions of Mr. McDermott's employment agreement . . . ." (Id. Ex. M.) This litigation ensued shortly thereafter, with QBE raising claims for breach of contract, misappropriation of trade secrets, and tortious interference with business relations.

In this Motion, QBE asks for an injunction prohibiting McDermott from working at Hudson or any competitor until December 19, 2015, which is one year from the date he was to have been laid off from QBE.

---

[1] McDermott contends that QBE's President told him in October 2014 that McDermott could work for another crop insurance company. This is hearsay, but even if true, it is clear from the record that QBE informed McDermott repeatedly that it intended to enforce the restrictive covenants in his employment agreements. (See, e.g., Compl. Ex. G (Dec. 3, 2014, letter from QBE to McDermott).)

**DISCUSSION**

A preliminary injunction may be granted only if the moving party can demonstrate (1) a likelihood of success on the merits, (2) that the movant will suffer irreparable harm absent the injunction, (3) that the balance of harms favors the movant, and (4) that the public interest favors the movant. Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). Injunctive relief is considered to be a "drastic and extraordinary remedy that is not to be routinely granted." Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).

Restrictive covenants in employment agreements are disfavored under Minnesota law. Freeman v. Duluth Clinic, Inc., 334 N.W.2d 626, 630 (Minn. 1983). However, those covenants are enforceable if they are reasonable, there is consideration for the agreement, and the employer's legitimate interest is greater than that of the employee. Webb Pub'lg Co. v. Fosshage, 426 N.W.2d 445, 449-50 (Minn. Ct. App. 1988).

**A.     Likelihood of Success**

The success of the Motion depends almost entirely on the enforceability of the covenants not to compete in the various employment agreements McDermott signed. McDermott contends that the agreements are unenforceable because they were not validly assigned to QBE, they were not supported by adequate consideration, the final agreement is overbroad, and it is not related to a legitimate interest of QBE that is greater than McDermott's interest.

### 1. Assignment

Section 10(a) of the original employment agreement provides that NAU could assign the agreement "to any subsidiary or affiliate formed to conduct the Business and, with the consent of the Employee, which consent will not be unreasonably withheld, to any other person or entity that is a subsidiary or affiliate of the Company." (Compl. Ex. A. § 10(a).) McDermott argues that QBE is NAU's parent corporation, not a subsidiary or affiliate of NAU. Moreover, McDermott contends that QBE is a holding company that does not itself conduct any crop insurance business. Thus, according to McDermott, the agreements could not be validly assigned to QBE absent his consent, and he never gave his consent. He maintains that the one-year noncompete period began when he became a QBE employee in 2012. His covenant not to compete therefore expired in 2013 and is unenforceable.

But section 10(b) of the original agreement provides that NAU will "require any successor (whether direct or indirect, by purchase, merger, consolidate or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement." (Id. § 10(b).) McDermott argues that QBE is not a successor, but offers no authority that an acquiring company is not a successor as that definition is commonly understood. McDermott does point out that section 10(b) is not an assignment provision, but he does not and cannot contend that 10(b) is not the governing provision for the purposes of determining whether QBE can enforce the restrictive covenants here. The logical reading of section 10 is that, if NAU's crop insurance business is transferred to another entity, § 10(a) governs and the agreement is assigned to that entity.

If NAU is acquired or merges with another company, however, the agreement need not be assigned because, under § 10(b), the acquiring entity succeeds to all of NAU's rights and obligations under the agreements. The second scenario is what happened here, and QBE therefore succeeded to NAU's rights and obligations and is entitled to enforce the agreements.

### 2.  Consideration

McDermott's only argument regarding consideration is that, because he received no additional consideration for entering into restrictive covenants when he became employed by QBE in 2012, there was no consideration. Again, he has no legal authority whatsoever for this proposition, and it is not only legally unsupportable but factually incorrect. The second April 2010 agreement itself provides for whatever consideration might have been required for QBE to enforce the agreements, by providing for a retention bonus so that McDermott would continue working at QBE. But in any event, McDermott did not get a new job in 2012 and the covenants to which he agreed in 2010 did not change, and therefore there was no requirement that QBE offer him additional consideration to support those covenants at that time.

### 3.  Not Necessary to Protect Legitimate Business Interests

McDermott argues that prohibiting him from working in the crop insurance industry altogether is overbroad and not necessary to protect QBE's legitimate business interests. He cites only one case in support of this proposition. (Def.'s Opp'n Mem. at 17 (citing Novus Franchising, Inc. v. Dawson, No. 12-529, 2012 WL 3031235 (D. Minn. July 25, 2012)).)

This case involved a two-year restriction on employment "in any related business that is in any way competitive with or similar to" the franchisor's business. Novus Franchising, 2012 WL 3031235, at *2. The facts of that case are unique to the franchise area, however, and the court's concerns about the extent of the restriction do not translate to the employment arena. In addition, because the case involved a restrictive covenant twice as long as the one at issue here, it is distinguishable.

McDermott also contends that the noncompete is overbroad because it does not have any geographic or customer-specific restrictions. He argues that given his age and his experience—which is solely within the crop insurance industry—the noncompete is too restrictive. McDermott also contends that his positions with QBE did not involve direct contact or involvement with agents and brokers. Although his new employment with Hudson does involve such contact and involvement, he contends that there is no danger that he will lure agents away from QBE because he did not work with any agents closely in his job at QBE and thus had no relationship with agents or brokers that would be compromised by his new position with Hudson.

McDermott points out that the original 2006 employment agreement contained no noncompetition provision, but only confidentiality, nonsolicitation, and nondisparagement provisions. (Compl. Ex. A § 9.) The first amendment, executed in 2008, also did not contain a noncompete, although the nonsolicitation provision prohibited McDermott from soliciting or communicating "with anyone named as an agent, insured or assured under any policy of insurance written by or through the company during the twelve (12) month period

8

immediately preceding his termination for the purpose of marketing, selling or writing any crop insurance or crop insurance products." (Id. Ex. B. ¶ 10(i).) This nonsolicitation provision was in force for 18 months following McDermott's termination. (Id.) The first April 2010 agreement did not purport to amend any previous restrictive covenants. (Id. Ex. C.) Only the last agreement, the second April 2010 agreement, contained an explicit noncompete. McDermott asks the Court to infer from this change that a restrictive covenant was not necessary to protect QBE's legitimate business interests. Another inference, however, is that in April 2010, McDermott got a promotion that made him one of the upper-level individuals in the company, and necessitated a broader and more restrictive covenant not to compete.

McDermott is a sophisticated individual with a long history in the insurance field. He signed all of his employment agreements and therefore knew the terms under which he was employed. In light of McDermott's extensive experience in the crop-insurance industry and his high-level national job with QBE in that industry, the restrictive covenants are not overly broad and are legitimately related to QBE's business interests. They are therefore enforceable.

Finally, McDermott argues that the noncompete is overly broad because QBE has no legitimate business interests in the agents with whom McDermott had preexisting relationships. In other words, he contends that he had relationships with agents that were formed before he went to work for NAU in 2005, and that QBE cannot make him give up his right to do business with these supposed preexisting clients.

This argument is nonsensical. Any "client" McDermott had in 2005 is long since a client of NAU/QBE and no longer McDermott's client. Moreover, given McDermott's nearly decade-long employment, and his claim that he did not have any direct contact with these supposed preexisting relationships in the last nine years of his employment, his contentions in this regard are without merit.

### 4. Temporal Scope

McDermott contends that the one-year scope of the noncompete is broader than necessary, given QBE's concession that more than 80% of their renewals take place by March 15. But McDermott agreed to the one-year noncompete, and he points to no authority for the proposition that a one-year noncompete is overly broad. Courts repeatedly enforce one-year covenants not to compete. E.g., Fosshage, 426 N.W.2d at 450 (enforcing one-year nationwide restriction); see also . IKON Office Solutions, Inc. v. Dale, 170 F. Supp. 2d 892, 896 (D. Minn. 2001) (Doty, J.) (enforcing three-year restriction throughout North America).

However, given the preliminary procedural posture of this case, the Court is unwilling to impose a 12-month restriction at this juncture. Rather, the Court believes an initial six-month prohibition on McDermott's employment in the crop insurance industry more fairly balances the harms and accounts for the equities of the situation, given the preliminary record and the nature of the evidence adduced thus far in the matter. Should QBE believe that an additional injunction is necessary for the remainder of the noncompetition period, it should move the Court for a permanent injunction to that effect.

**5.     Trade Secrets Claim**

QBE argues that it is likely to succeed on its misappropriation-of-trade-secrets claim because McDermott was "intimately involved in the development of QBE's marketing and business strategy plan for 2015." (Pl.'s Supp. Mem. at 21.) McDermott contends that this is insufficient to establish that he possess any trade secrets because QBE has not identified "specific items or pieces of information regarding QBE's plan for 2015 that McDermott possesses." (Def.'s Opp'n Mem. at 30.) QBE submitted additional evidence in reply, establishing that McDermott was involved with confidential programs such as QBE's "special" agent commission structure, and that the communication of such information to QBE's competitors would harm QBE's business interests.

For purposes of this Motion, QBE has established that it is likely to succeed on its misappropriation claim, and this claim also supports the issuance of an injunction.

**B.     Irreparable Harm**

Breach of a valid restrictive covenant raises an inference of irreparable harm. IKON, 170 F. Supp. 2d at 898. McDermott ignores this inference, arguing instead that any loss of customers is compensable by monetary damages. But the only case McDermott cites for this proposition is not on point. (Def.'s Opp'n Mem. at 33 (citing CHS, Inc. v. PetroNet, LLC, No. 10-cv-94, 2010 WL 4721073, at *5 (D. Minn. Nov. 15, 2010) (Kyle, J.)).) CHS involved a claim of copyright infringement against a consultant who had designed billing software for the plaintiff fuel company. CHS, 2010 WL 4721073, at *1. Once the project was finished, the consultant formed his own business marketing substantially similar software to other fuel

suppliers. Id. at *2. CHS sued, alleging copyright infringement and trade-secret misappropriation, and after 10 months of discovery, moved for an injunction. Judge Kyle denied the requested injunction, finding primarily that CHS's delay in seeking injunctive relief meant that there was no irreparable harm involved. Id. at *4. Judge Kyle also noted that any lost sales or customers could be compensated with money damages. Id. at *5.

The harm QBE alleges here is different. It includes lost customers and sales, but it also is the harm from the breach of a restrictive covenant and an employee potentially sharing trade secrets with a direct competitor. This is why courts treat covenant-not-to-compete injunctions differently than other injunctions: irreparable harm is presumed when an employee violates a valid restrictive covenant. That is what happened here, and QBE has established that it will suffer irreparable harm without the injunction it seeks.

**C.     Balance of Harms**

McDermott contends that the balance of harms favors him because the restriction is overbroad and he is near retirement age. But there is no case under Minnesota law, or even in the Eighth Circuit, holding that the Court should take into account an employee's age when deciding whether to enforce a restrictive covenant. McDermott signed the employment agreements with restrictive covenants and accepted the benefits those contracts provided. He is therefore bound to the restrictions in those contracts. Although he will suffer some harm by being unable to work in his chosen profession, this harm does not outweigh the irreparable harm QBE has established.

**D.     Public Interest**

The injunction "supports the reasonable enforcement" of valid restrictive covenants, and is therefore in the public interest. IKON, 170 F. Supp. 2d at 898.

**CONCLUSION**

QBE has established that it is entitled to injunctive relief preventing McDermott from working for a competitor and enforcing the noncompetition agreement he signed. Because of the procedural posture of the case, however, the Court will restrict the injunction to a period of six months, without prejudice to QBE's rights to move for a permanent injunction covering the remainder of the 12-month period in the noncompetition agreement.

Accordingly, **IT IS HEREBY ORDERED that**:

1. Plaintiff's Motion for Preliminary Injunction (Docket No. 5) is **GRANTED**;

2. Defendant John McDermott is **ENJOINED** from directly or indirectly engaging in or becoming associated with any competitor of QBE in the crop insurance business for a period of six months from the date of this Order;

3. Under Rule 65(c), to secure the issuance of this injunction, Plaintiff must post a bond in the amount of $250,000 within five business days of the date of this Order.

Dated: January 9, 2015

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge